Good morning, Your Honors. May it please the Court, I'm David Lieberman on behalf of the appellant plaintiffs, Krishna Lunch. All of the Krishna Lunch appellants in this case are strict and loyal followers of the Krishna Consciousness religion, and they seek to exercise or practice a core religious component of their religion by distributing vegan and vegetarian food to as many people as possible. Now, the cases of Krishna Consciousness which the Court is most familiar with are probably involving literature distribution, both in this Court and many others, including the United States Supreme Court. But this is just as important. In all of those cases, religious literature has been unequivocally recognized as fully protected by the First is a core religious practice. It can only be prepared, of course it's no meat, fish, or eggs, it's vegetarian or vegan, and it can only be prepared by priests, special persons, who cook and then offer this food in a religious ceremony by which it becomes sanctified, or prasadam, as we refer to in our briefs. And the Krishnas believe that anybody who eats this prasadam gets spiritual benefit. But of course, in addition to that, there's a free speech component. Taking up the free speech component first, the argument that you raised in the District Court, the District Court said there was essentially no expressive conduct. That's right. The Court said that... Rule 12b-6 on the pleading, she tossed out the case. That's right. She said there was... Can I follow up with that? Is there any case that you have researched which holds that the Well, the Fort Lauderdale Food Not Bombs comes close... Fort Lauderdale Food Not Bombs. That's the 11th Circuit. That's the 11th Circuit. And that comes very close to holding that the food sharing in a public park to feed the homeless, which was also vegan and vegetarian food, by the way, does have inherent communicative components. For example, on Thanksgiving, on Rosh Hashanah, on Passover, every preparation in that service has meaning. It's a symbol. In Rosh Hashanah, not Rosh Hashanah, but Passover, the passage of the Jews for Jesus. In Thanksgiving, it means freedom from the British and overcoming those obstacles that the early founders of our country faced. But as I understood the 11th Circuit's decision, the circumstances, it was not only passing out food, but they made it clear that it was for the homeless, if I remember correctly. Well, I don't think they did make it clear that it was for the homeless. I mean, they had a multifaceted message that this money should not be spent on war, food not bombs, and instead should be used to help the fully applicable to this case is the surrounding circumstances. Now, we contend that prashadam, vegan, vegetarian food, is inherently expressive because of all the holidays that are centered around food and the type of preparations that are served at that time of the year, they have inherent symbolic meaning. But on the other hand, in the surrounding context of the program as a whole, this case is foursquare on food not bombs, Fort Lauderdale case. There are banners, there are tables, there is literature being distributed, there are full time Hare Krishna devotees speaking to interested people. So you have, there's no mistake that anybody, and it also takes place, more importantly, in a very highly visible part of the UCLA campus. It's a little alcove and just right next to Bruin Marks, which UCLA is itself set aside for free speech. But does that give the Krishna folks some sort of a right to command that space on as aggressive a schedule as you've authorized and offered space in the regular food area on fewer occasions, granted, but what is it that gives them some sort of priority to perform at that spot for as often as they want? Well, first of all, we contend that this area is a public forum. It's open to the public without restriction. It borders the free speech area that the university has set aside for free speech activities on its own accord. And this area was assigned by UCLA. In previous negotiations, UCLA identified this area. But there was no restrictions on your clients for using that area to exercise speech. The only restriction was a limitation on the frequency in which they could deliver food with that speech, correct? Four times a year is not really- The district court never got- the district court said there's no expressive conduct here, right? Toss the case. That's what the district court said, yes. The university didn't raise its defense, which would obviously be time, place, and manner. That's right. There's no time, place, and manner restrictions, which apply to everybody that wants to sell food at the university. Right. The university didn't raise it and didn't put forward the basis for its four times a year restriction- Right. On serving- on outsiders serving food at the university. That's correct, Your Honor. So we haven't got to that stage yet. Unfortunately, after many years in the district court, we have not reached that point. But I have to concede that, yes, the only issue in this case is on its face. Is food distribution, as alleged in the complaint, a form of free speech? Is it protected by the free speech clause of the First Amendment? And secondarily, is it- not secondarily, but co-equally, is it the free exercise of religion? And this is quite provocative because the Supreme Court, as this Court may be aware, has been flurrying with these issues. The same exact issues that we raised in our case, expressive speech in the form of food distribution and the hybrid right strict scrutiny test as applies to free exercise, was in the Masterpiece Cake case, which was just decided by the Supreme Court on other grounds. Isn't one of the required elements of expressive conduct that there be a great likelihood that the message would be understood by those who viewed it or heard it or who were getting the food, right? Well, that's the gray area, Your Honor. I mean, some- Basically, I'm quoting from the Ninth Circuit's decision in Edge v. Everett, Ninth Circuit, 2019. Right, but sometimes it's described in that way. But it doesn't have to be what the Court said in Fort Lauderdale Food Bar bombs. It needs to convey some kind of message that, yes, in Hurley, for example, what was the message? It was a number of people presenting diverse and singular views, and this is a whole context, the whole totality. It was conveying a message. So you don't have to have a particular- that's the whole point of Hurley. If I want to go give my speech and get my views across to people, and I have pamphlets to give them and I want to talk to them, I might entice them to stop at my table by offering free, really good-smelling chocolate chip cookies. I don't think that there's any argument that the delivering of the cookies under what I've just described in my circumstance would be expressive conduct. Here, as I understand it, you're arguing that, no, the delivering of the food is part of the expressive conduct, and where is there allegations in the complaint or plausibility to those allegations that the people walking by on Bruin Walk would perceive and understand the delivery of the food to be part of the expression of the message, as opposed to just enticing them to stop? Yeah. No, the same way that the people in Park, in Straub Park in Fort Lauderdale, understand here's a group of people. They're distributing food. They have signs. They have banners. They have literature. They're talking to interested people. Not the explanatory speech makes the food itself expressive. Food, we say, if we look at many cultural and religious holidays, the food, I was tempted to go down this road in my briefing, but the medium is the message, the medium is the message, that the only way that we can get people to stop eating meat, stop this animal slaughter, to address these issues with global warming and climate change, end these factory farms, is giving people and getting them to give up meat. There's no better way, and there is no other way to do that by here. Try this food. Eat this food. And when they do, they will do these other things. If I offer you matzah on Passover, I get that that's expressive. If I offer you matzah, let's say, in July, is it expressive? Yes. How so? Because I'm going to relate back when I get to matzah, aside from the fact that I love it. But besides that point, I'm going to know that that matzah is historically, and this is one of the issues that the court in the Food Not Bombs for Laredo case brought up, the historical context, that matzah and the other preparations that served in Rosh Hashanah are associated with Rosh Hashanah. So I may eat it at other times of the year, but it's still going to relate back to that basic holiday in which it is an essential component. So if you have a Catholic priest out there wearing the collar on a Friday serving fish, everybody's going to know what these are doing. Everybody's going to know what that means. Our problem is... They ate the fish on a Wednesday. Is it still expressive? Well, in my day, they did it on Friday. They ate the fish. I don't remember if there's been any changes. I don't think so. But you get the point. If a priest is out there serving something on Friday, you know, fish sticks or something, everybody's going to know this is part of a religious observance. So anybody who sees a Hare Krishna serving vegetarian and vegan food, they're going to associate that Hare Krishna. We know Hare Krishna. They believe that animals have a soul, like human beings, and they shouldn't be killed. They should be protected. The government has an obligation to protect them. And in our audience, this is important. Why UCLA? Why not downtown Westwood? Why not the Rose Bowl or something like that? Because students, young people, they're going to have to grow up in this world of global change, climate change and global warming. I'm going to be gone. I'm pretty confident of that. But they're going to still be here. So if I say to you vegan, you immediately, everybody knows what's going on. Every day you open the paper, Beyond Meat, Impossible Burger, Burger King. The meat industry is now trying to trademark the word meat and prevent these pro-animal groups from using meat on their packaging. And they're promoting. Celebrities are just on the plane yesterday. I was on a flight and this one actor, Jack Black. I don't know if you've ever heard of him. He said it's time to go to a vegan diet. I'm giving up my hamburgers. Another YouTube star. She was a vegan and she converted back to meat and she's getting pillory on social media. But as soon as the representative from New York, for example, Cortez, I believe, the young lady, it was just elected, was her Green New Deal. What did the Republicans do with that? They're going to take away our hamburgers. They immediately associated that with the bigger issue. To resolve your case, all we have to do is look at what you alleged in the complaint. Yeah, it's all there. Worry about what's going on. All these allegations are in there. And here's the point. It wasn't just food that you alleged that they wanted to distribute. You alleged other things surrounding the Krishna and how it was going to be done. Yes, it's called Krishna Lunch and it's a little program on campus. And it does have these other features. And we did those features before we saw the food not bombs case, which kind of came out of the left field as a godsend for us, at least. But we already do that. I mean, the Hare Krishnas are well known. Do you want to say it's time for a rebuttal? Yes, I do. All right. Okay, thank you. On the other side, we can sit at this table over here. Good morning. May it please the Court. Neil Lloyd on behalf of the defendant. For more than four decades, the Anderson and Spence cases have provided a guidance for courts that is clear, that is workable. The first question is whether the conduct that is being regulated qualifies as purely expressive. And the second, if it's not, does it require an interpretive step? If it requires an interpretive step, then as Judge Simon was saying, and as the Court recently said in the Edge case, the question is whether there is a message that is being conveyed, a particularized message, and a great likelihood that that message is going to be understood. What the plaintiffs are asking for in this. Particularized? Well, it has to. It has to be communicative, doesn't it? It has to be communicative. It does. And there has to be a great likelihood that it's understood. I mean, there are obviously, Your Honor, slight variants in the test over time. I think in this case, there isn't really a dispute. Do we have to read Hurley and all the other cases besides Spence? Oh, absolutely, and Fair, and absolutely. And I think that, and I believe that the Knox case did. I believe that the Edge case did. I mean, in the Edge case, the question was whether clothing, optional baristas, right, were trying to convey a message of body positivity and image consciousness. And what the Court said is, it's really just as likely that the image that you're conveying is, the more you tip, the less I wear. And that's not protective activity. Here, there is no great likelihood that this message would be understood. You know, counsel said to you in response to Your Honor's question, everything is there in the complaint. I have to respectfully disagree with that. If we look at the district judge's opinion, and specifically I'm looking at document 39, page 6 of 8, footnote 5, the district judge said, plaintiffs also state that a reasonable person would understand that Krishna Lunch is trying to convey a message because, quote, it is visibly conducted by the Hare Krishna group, which is renowned for its vegetarian-vegan food, unquote, citing opposition at 15. The Court continues, plaintiffs do not cite to any factual allegations supporting this assertion. That was on the second dismissal. The Court gave the plaintiffs a third chance. Maybe Rule 11 served as a guardrail here because they didn't allege that. So they're coming to you now and saying, we are the Hare Krishnas, everybody understands that vegan and vegetarian food is part of what we are and that everybody's going to understand that particularized message or even just that particular message. They're not. There are so many different reasons why people might consume vegan or vegetarian food, because they think it's healthy, because of animal protection, because they think it will lead to a higher consciousness, because it's something that is a fad right now. There are lots of different reasons. I went and had breakfast down the road and turned out I looked at the menu and everything that I had on there was vegan. And the message they were conveying is, if you give me $15, I will give you this cereal. My son who's vegetarian, if I go over to his house for dinner, he makes me a vegetarian meal, that probably doesn't have a communicative message by itself, but if I get a vegetarian meal from some members of the Krishna consciousness at a table on the Bruin Walk, on a free speech walk, why doesn't that pretty clearly have a communicative message? Because there's no way to get a message across to you without inoculating that message with speech. There are so many different reasons they could be saying, we want to give you this vegan food, including we'd like you to join our group, including all of the reasons that counsel says, but which haven't been alleged. Again, we're stuck with the complaint here. I grew up in Southern California, moved to Chicago. There were fewer Krishnas in Chicago than there were in Southern California. What I remember about the Krishnas was they would chant, they would proselytize. I knew nothing about all this. No one does because it's not in the complaint. If the district court would have disagreed and would have said, for complaint purposes, that is a sufficient allegation, maybe it will be proven or established in summary judgment, maybe it won't be, what would have happened next in this case? I believe that, as Judge Pius said, we would go into the reasonable time, place, or manner restrictions. Yes, Your Honor. Reasonable time, place, and manner restrictions. That is correct. Assuming it's communicative. That is absolutely correct. It might be the case that, at that point, we would then go in. As the Court is aware, in the Edge case, if I'm getting the procedural context right, that came up on a preliminary injunction. There was evidence and there were declarations. There might be an evidentiary presentation. We might have that evidentiary class to show no one's really getting this message. The message they're getting is we're giving vegetarian food, other people are giving free Red Bulls, other people are giving drinks. When I look at the first amended complaint, which I think is the operative complaint. I believe it's the third, Your Honor. I believe so because I think it was the third. They amended once, it was dismissed. They amended a second time, it was dismissed. They amended a third time, that was dismissed, and then we're here. I've got the wrong complaint, but I gather there weren't many facts? No, there were just slight tweaks. That's correct. And a patient district court, but it's a motion to dismiss. Because they do, at least in the version of the complaint that I'm looking at. Yes. Paragraph 16, 17, 18, they talk about the core tenets. They talk about their core tenets, absolutely. Of the faith, about the program, about the food, veganism. Yep, and that's why, Your Honor, I'm not to interrupt. I don't think here, particularized messages. You look at the allegations of the complaint, and you're supposed to look at it in the light most favorable to the pleader. Absolutely. And you can draw reasonable inferences from it. About what they're intending to convey, but not about whether it would be received. And that, Spence and Anderson all say, this court looks at the context. Wouldn't that be more of a question of fact? I don't think so, not in this case. And the main reason is that food distribution has never been held. If you're talking about simple food distribution by itself, you might have a good point. But as Judge Simon said, when you put it in this kind of context, why doesn't, I mean, I don't understand why at least it's not plausible that it doesn't have a communicative aspect to it. Well, we respectfully disagree, Your Honor. There is no great likelihood that any kind of message is going to be received, any particularized message, and particularly if the messages that they're saying are going to be received, as opposed to some other type of message. So, I mean, your point is that, and you think this is what the district court said, is that they had to allege that somebody walking by would have understood the communicative message. Right, and I think that they didn't because I think that Rule 11 would have gotten their way because I don't think that most people would agree with counsel that seeing Harry Christens distributing food would mean that. In any of the motions to dismiss the original complaint of the first or second, or in the judge's rulings on those, did either your side say this complaint is deficient because it doesn't allege what the hearer or seer would perceive, or did the judge say that's something that's missing from the complaint? Well, that was the part I was just quoting to you, Your Honor. I mean, they said, I mean, what the court said in the second dismissal order is, I think you're getting closer, and so I'm going to give you a third chance. And when I first started looking at the case, my sense was that this footnote was a road map. Go put that allegation in the complaint. And they didn't. And there's a reason why they didn't. And I think the reason is they wouldn't have been able to prove it. But that's not for me. I mean, for this court, so I think that. So the question of whether somebody would reasonably perceive it as a communicated message. Great likelihood, great likelihood. Is it a question of law? On the undisputed facts in the complaint, the court is allowed to look at the context. Absolutely. I mean, for example, in the Knox case. If you look at the context as alleged, and what I envision is a table with the food, with the Krishna, with their chanting, with their signs. Yes. And they're serving vegan food, which is part of their religion. And they're handing out handbills. I mean, that sure sounds like it's a communicated message. And that somebody walking by would have understood that this is part of their religion. Well, I understand, Your Honor. I don't think that there is any great likelihood that any particularized message would be understood. Why wouldn't it be the case that what they're really saying is, look, we're going to give you free food. We would like you to come and talk to us. And, by the way, we've got a restaurant down the road that you can come to. Why wouldn't that be the same kind of message? Again, the baristas alleged in the Edge case that they were communicating a message of body positivity. That's what they alleged. They had affidavits that said that. In Knox, the plaintiff alleged that she had a message that she was conveying to people when she collected their absentee ballots to go and take them in the mail. And that message was, exercising the franchise through the post is a good idea. The district court said and this court affirmed, no, it's not. It could just as easily be that you're engaged in some sort of voter scam or that you're steaming open the ballots. In other words, in Edge, the regulation was reasonable because it was attempting to stamp down on prostitution and on sexual assault on the baristas. In the Knox case, the point was we need to have reasonable regulations to ensure that the franchise is properly executed. In both cases, there were allegations of specific messages. In both cases, this court said there's no likelihood that that message is going to be received and understood. Turning just briefly to the free exercise claim, the plaintiffs can define their religion, their sincerely held religious belief, however they would like to define it. That's not up to us and it's not up to the court. What can't happen is that a religion is defined in such a way that no regulation could possibly occur. What they are saying on their free exercise claim is that by having a general, neutral rule of general applicability that limits everybody, not just the Krishnas, but everybody to four times a year, they're saying an unreasonable burden on their religion is happening. Such that, again, this court is going to get the federal judges are going to start regulating who gets to serve food on the UCLA campus because that's what we're talking about. We're talking about discovery. We're talking about 1988 attorney fee shifting. We're talking about great expense. Why? Because they've defined their religion to say we need to distribute this food and your restrictions on our food distribution are unreasonable. Imagine, if you will, that a religion had determined that it was actually for these students, these young people that counsel is talking about, that it actually was more effective, most effective in conveying a message to awake people out of REM sleep. And out of REM sleep, that's when you would really convey the message best. So you're going to go and walk around campus with a bullhorn saying, here is what we need to control global warming or go after terrorists or whatever your particular religious conviction is. No one would suggest that a content neutral rule of general applicability would prevent the university from saying you don't just get to go around campus doing that, even though you could agree that their religious message might be conveyed in their words more effectively if you let them do it that way. Counsel, you heard opposing counsel say this was a public forum. Do you concede that? No, we do not. First of all, that wasn't decided in the district court, and we don't concede that. It is not an area that for two specific reasons. First of all, there is no 24-hour access to this area. It is true that on Bruin Walk that is an area that is allowed for leafleting and speeching and various other kind of proselytizing, all kinds of different free speech activities, and there's been no allegation that the Christians have been restricted in going on Bruin Walk and doing that. But first of all, it's not a 24-hour unlimited use, so it's highly regulated. Secondly, what the Christians wanted to do was install a structure. So this was something where they were going to go and they were going to build a structure or install a structure there to do their food service. You mean a permanent structure? Well, they would say it could be movable. They said in terms of the expense, they would be installing something, though. It would be like a table, a stand with dishes and various other things. There is no general allowance on the campus for that. So no one gets to do that. Do they get to bring in temporary tables? I don't think so. On Bruin Walk? There are no tables? My understanding is not without permission. So in other words, well, I understand, Your Honor. Everybody needs to get permission, I would gather. It doesn't sound like it. It sounds like they're asking the court to get into the business of food distribution regulation under the guise of the First Amendment. But no, we haven't conceded that. It hasn't been litigated in the district court. Our view is if it were to be litigated in the district court, this would be considered to be, if anything, limited in terms of the public forum. It's not a general public forum. And that the regulation that they are applying is something that is certainly viewpoint neutral. I mean, it's not singling out the Christmas food versus anybody else's food. Okay. Do you want to say anything else? I don't think so. I appreciate the court time. Thank you very much. Thank you. Thank you. Typically, the opposing counsel does exaggerate quite a bit of material in this day and age. It's a very temporary event. If you walk on the campus at UCLA any day of the week, you will see all kinds of tents, structure, cooking apparatus. There's things going on there 24-7. And UCLA can easily accommodate this 100 square feet of space. But if you erect a tent, you would have done that with some sort of approval. Yes. Oh, yeah. No, we're not going to go out there and do it without permission. But we're not going to have much of a footprint there. And it's a very innocuous program. It's in an area already set aside from that. It's paved concrete. And there already are benches and other facilities nearby. But you could go out there and have four times a year. Well, as we've explained, to get people to change their diet, they have to have the ongoing cultivation. We're not saying 24-7 we're going to be there at midnight serving our food. We're willing to abide by all reasonable time, place, and manner regulations and can satisfy them, health, safety, insurance, pedestrian congestion. These are red herrings. There's no issue with these things. We can easily accommodate those concerns. Did you plead in the third amended complaint that there was a great likelihood that the message sought to be communicated would be understood by those who viewed it or walked by it? Not specifically in those terms, Your Honor. Why not? Well, as some of Your Honors have pointed out, it is a factual question how the audience will perceive that. What we are saying is that if it's communication, it takes an intent to communicate and that the audience will understand. And we pointed that out. Yes, that the audience will understand what our message is. And we've spent a lot of time talking about the social background, the context, the armbands and Tinker and the backdrop of the Vietnam War. So we've certainly alleged that in the context of what's going on in the world right now with climate change, with global warming, with the health concerns of eating meat, with the debate between the new meat plant-based companies and the meat industry, that, yes, in that context, in that environment, the audience will understand the message. And before I forget, I just want to – it seems like the free exercise clause is the orphan in all this. It is – I tried to explain or emphasize it as a core religious belief and practice. And the Supreme Court, I think, has confirmed that our companion claims of speech and association are substantial. And this Court, as Judge O'Scanlain will know more than all of us in the Thomas case, established the test for when does strict scrutiny apply to free exercise. Our claims for speech and association are not a kernel of speech, as UCLA has said. They are substantial. They are a colorable claim. It doesn't have to be a slam dunk of winning on the merits ultimately down the line. It just has to be a likelihood, a likelihood, a reasonable probability that we will be successful. It doesn't have to be we're going to win on that. So we also argue that strict scrutiny applies to this case, not rational basis. Thank you, Your Honor. I appreciate your arguments. Counsel, appreciate your arguments that the case is submitted at this time. Yes, Your Honor.
judges: O'scannlain, Paez, Simon